UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GREGORY ASHWORTH,

                  Petitioner,                                Hon. Janet T. Neff

v.                                                  Case No. 1:13-CV-498

CATHY STODDARD,

                  Respondent.

_____/

## REPORT AND RECOMMENDATION

        This matter is before the Court on Ashworth's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Ashworth's petition be **denied**.

## BACKGROUND

        As a result of events occurring on July 9, 2009, Petitioner was charged with: (1) armed robbery; (2) conspiracy to commit armed robbery; (3) assault with the intent to murder; (4) conspiracy to commit assault with the intent to murder; (5) possession of a firearm during the commission of a felony (two counts); and (6) being a felon in possession of a firearm (two counts). (Trial Transcript, May 20, 2010, 26-29, 104).  Several individuals testified at Petitioner's jury trial. The relevant portions of their testimony are summarized below.

1

**Harry Taylor**

Taylor first met Petitioner and Tarver in approximately 2007, when the group was in jail together.  (Trial Transcript, May 20, 2010, 106-08, 148).  Petitioner was also known as Lil' Chucky and Tarver was also known as Purple or Lil' Purp.  (Tr. 105-06).  After being released from jail, Taylor encountered Petitioner and Tarver periodically "in the streets."  (Tr. 108-09).

On July 9, 2009, Taylor traveled to 2513 Owen Street, Saginaw, Michigan, where his aunt, Sherry Pought, resided.  (Tr. 104-14).  When Taylor arrived, his cousin, Alonzo Pought, was present.  (Tr. 113).  Shortly thereafter, Petitioner and Jason Tarver arrived at Pought's residence.  (Tr. 117-18).  Taylor, Petitioner, and Tarver began engaging in "general conversation."  (Tr. 118-20).  A few minutes later, the group was preparing to smoke marijuana together when Tarver pointed a gun at Taylor and instructed him to "go to the back yard" and "give it up."  (Tr. 118-24, 157).  Taylor understood this to mean that he was being robbed.  (Tr. 124).  Taylor was not carrying a weapon.  (Tr. 153).  The handle of the gun Tarver was brandishing was covered in black tape.  (Tr. 123-25).

While Taylor was being robbed, Petitioner was rummaging through Taylor's car.  (Tr. 125-26).  After Taylor surrendered his cash and sunglasses, Petitioner instructed Tarver to kill Taylor.  (Tr. 126-28).  Tarver hesitated at which point Petitioner took the gun.  (Tr. 128-31).  Petitioner instructed Taylor to walk to the back yard.  (Tr. 132-33).  Knowing that he would be killed if he complied with this instruction, Taylor attempted to run away but was shot by Petitioner before he could travel more than a "couple steps."  (Tr. 132-37).

**Andrew Franklin**

As of July 9, 2009, Franklin was employed as a physician specializing in emergency medicine. (Trial Transcript, May 21, 2010, 12-14). On this date, Franklin treated Harry Taylor following his transport to a hospital emergency room. (Tr. 14-15). Franklin determined that Taylor suffered gunshot wounds to his upper extremities as well as a gunshot wound "in the left chest, about three or four inches from the middle of the back." (Tr. 15). The bullet which caused this latter injury was determined to be resting "less than an inch from the spinal cord" and "within an inch, inch-and-a-half of the aorta and esophagus." (Tr. 16-18).

**Alonzo Pought**

As of July 9, 2009, Pought was living with his mother, Sherry Pought, at 2513 Owen Street. (Trial Transcript, May 21, 2010, 23-24). At approximately 9:30 p.m. that evening, Harry Taylor arrived. (Tr. 24). A short time later, Petitioner and Jason Tarver arrived. (Tr. 25-26, 36). Pought remained in the house while Taylor, Petitioner, and Tarver stood outside "conversating, having a good time." (Tr. 26-28). Some time later, Pought "heard gunshots." (Tr. 29). Pought thought that they were "just random gunshots that I hear all the time," so he did not immediately exit the residence. (Tr. 30). However, when Pought heard his name "being moaned or screamed a little bit," he walked to the door where he observed Taylor "laying out in the driveway." (Tr. 30-31). Pought immediately dialed 9-1-1. (Tr. 31).

**Charles Bell**

On the evening of July 9, 2009, Bell was driving down Owen Street when he observed Harry Taylor "laying on the ground shot." (Trial Transcript, May 21, 2010, 56-57). Bell stopped his vehicle and called for an ambulance. (Tr. 58). While waiting for an ambulance to arrive, Taylor told Bell that he had been shot by Lil' Chucky. (Tr. 59).

**Heather Fachting**

As of July 9, 2009, Fachting was employed as an Emergency Medical Technician (EMT). (Trial Transcript, May 21, 2010, 61-62). That evening, Fachting was dispatched to 2513 Owen Street. (Tr. 62). Fachting and her partner assessed Taylor's condition and transported him to the hospital. (Tr. 62-66).

**Anthony Teneyuque**

As of July 9, 2009, Teneyuque was employed as a police officer for the City of Saginaw. (Trial Transcript, May 21, 2010, 67-68). That evening, Teneyuque was dispatched to 2513 Owen Street to investigate a shooting. (Tr. 68). Teneyuque arrived on the scene before the paramedics and "made contact with the victim to try to assess his injuries." (Tr. 69). The victim informed Teneyuque that he had been shot by Lil' Chucky. (Tr. 70).

**Blake Hiben**

As of July 9, 2009, Hiben was employed as a police officer for the City of Saginaw. (Trial Transcript, May 21, 2010, 74-75). That evening, Hiben was dispatched to 2513 Owen Street

to investigate a shooting.  (Tr. 75).  When Hiben arrived on the scene, several other officers were already present attending to the victim so Hiben "began the search for evidence."  (Tr. 75).  As part of his investigation, Hiben recovered two fired bullets in the vicinity of where the victim was laying. (Tr. 76-79).

**Timothy Fink**

As of July 15, 2009, Fink was employed as a detective for the City of Saginaw. (Trial Transcript, May 21, 2010, 82).  On this date, Fink was investigating a different case when he discovered six fired cartridge casings in the driveway of a house located at 1923 Glenwood.  (Tr. 82-86).  Fink knew from experience that this particular house had "some connection to the Tarver family."  (Tr. 82-86).  These shell casings were submitted to the crime lab for analysis.  (Tr. 87-88).

**Jeff Wenzell**

As of July 9, 2009, Wenzell was employed as a police officer for the City of Saginaw. (Trial Transcript, May 21, 2010, 92).  That evening, Wenzell was dispatched to 2513 Owen Street. (Tr. 92-93).  After arriving on the scene, Wenzell assisted with the collection of evidence including the recovery of two bullets from the crime scene.  (Tr. 93-95).

**Terry Carpenter**

As of July 17, 2009, Carpenter was employed as a police officer for the City of Saginaw.  (Trial Transcript, May 21, 2010, 99).  On this date, Carpenter was informed that arrest warrants had been issued for Petitioner and Jason Tarver.  (Tr. 99-100).  Later that afternoon,

Carpenter encountered Jason Tarver exiting the house at 1923 Glenwood. (Tr. 100-07). Carpenter identified himself as a police officer and instructed Tarver to stop. (Tr. 100-03). Tarver instead fled from Carpenter and was not immediately captured. (Tr. 103-07).

**James Hildebrant**

As of July 17, 2009, Hildebrant was employed as a police officer for the City of Saginaw. (Trial Transcript, May 21, 2010, 116). On this date, Hildebrant "heard via radio traffic" that Jason Tarver was fleeing from Officer Carpenter. (Tr. 116-17). Hildebrant proceeded to 1923 Glenwood where he assisted in searching the area through which Tarver fled. (Tr. 117-22). This effort resulted in the discovery of a .38 caliber Smith & Wesson revolver with black electrical tape on the grip. (Tr. 117-22).

**Ian Wenger**

As of July 17, 2009, Wenger was employed as a police officer for the City of Saginaw. (Trial Transcript, May 21, 2010, 123). On this date, Wenger proceeded to Glenwood Avenue to assist in the search for Jason Tarver. (Tr. 124). Officer Carpenter informed Wenger that Tarver "was holding his waistband as if he had a gun." (Tr. 124). A subsequent search of the area through which Tarver fled led to the discovery of a handgun. (Tr. 124-27). Wenger removed the bullets from this weapon and secured them as evidence. (Trial Transcript, May 25, 2010, 16-17).

**David Rocha**

As of July 9, 2009, Rocha was employed as a police officer for the City of Saginaw. (Trial Transcript, May 21, 2010, 128).  On this date, Rocha was dispatched to 2513 Owen Street to investigate a shooting.  (Tr. 128).  Rocha accompanied Henry Taylor in the ambulance as he was transported to the emergency room.  (Tr. 129-30).  Before arriving at the hospital, Taylor stated to Rocha that he had been shot by Lil' Chucky.  (Tr. 129-30).

**Barry Nelson**

Nelson was employed as the Executive Deputy Director for Saginaw County 9-1-1. (Trial Transcript, May 25, 2010, 8).  Saginaw County utilizes ShotSpotter technology which "listens for gunshots and basically pinpoints with GPS coordinates on a map basically where the shots were fired."  (Tr. 9).  According to ShotSpotter, on the evening of July 9, 2009, six gunshots were fired at 2513 Owen Street.  (Tr. 9-11).

**Ronald Crichton**

Crichton was employed as a firearms and tool marks examiner with the Michigan State Police.  (Trial Transcript, May 25, 2010, 19).  Crichton examined the weapon discovered by Officers Hildebrant and Wenger on July 17, 2009.  (Tr. 24-27).  Crichton also examined the bullets and shell casings recovered by Officers Wenzell and Fink, respectively.  (Tr. 24-27).  Crichton concluded that the bullets and shell casings had all been fired by the weapon in question.  (Tr. 24-27).

Following the presentation of evidence, the jury found Petitioner guilty of all eight charges. (Trial Transcript, May 25, 2010, 100). Petitioner was sentenced to serve 468-900 months in prison on the (1) armed robbery; (2) conspiracy to commit armed robbery; (3) assault with the intent to murder; and (4) conspiracy to commit assault with the intent to murder convictions and lesser sentences for the other convictions. (Sentence Transcript, July 22, 2010, 8-9). Petitioner appealed his conviction to the Michigan Court of Appeals asserting the following claims:

I. The prosecution submitted insufficient evidence to convict Appellant of conspiracy to commit armed robbery and conspiracy to commit assault with intent to commit murder and those convictions violate his state and federal constitutional rights to be free of conviction in the absence of proof beyond a reasonable doubt.

II. In the alternative, in the context of this case, where evidence of conspiracy was satisfied merely by evidence of the substantive offense, Appellant's convictions for both conspiracy to commit armed robbery and armed robbery and his convictions for both conspiracy to commit assault with intent to commit murder and assault with intent to commit murder violated his constitutional right not to be twice put in jeopardy.

III. The prosecutor violated Appellant's due process rights by eliciting unfairly prejudicial testimony about Appellant's prior juvenile incarceration; furthermore, defense counsel was constitutionally ineffective for failing to object.

IV. The judgment of sentence must be amended because Appellant's sentence for felony firearm was erroneously imposed consecutively to his conviction for conspiracy to commit assault with intent to commit murder.

The Michigan Court of Appeals affirmed Petitioner's "convictions and sentences,"

8

but remanded the matter to the trial court "solely for the ministerial purpose of amending the judgment of sentence." *People v. Ashworth*, 2011 WL 5555825 (Mich. Ct. App., Nov. 15, 2011). Asserting issues I-III above, Petitioner unsuccessfully moved in the Michigan Supreme Court for leave to appeal. *People v. Ashworth*, Case No. 144381, Order (Mich., April 23, 2012). Petitioner initiated the present action on May 8, 2013, asserting the four issues identified above.

## STANDARD OF REVIEW

Ashworth's petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254. The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

> (d)   An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or
>
> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law

9

when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at an opposite result." *Ayers v. Hudson*, 623 F.3d 301, 307 (6th Cir. 2010) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case" or if it "either unreasonably extends or unreasonably refuses to extend a legal principle from the Supreme Court precedent to a new context." *Ayers*, 623 F.3d at 307. Furthermore, review under § 2254(d)(1) "is limited to the record that was before the state court that

10

adjudicated the claim on the merits." *Cullen v. Pinholster*, - - - S.Ct. - - -, 2011 WL 1225705 at *8 (Apr. 4, 2011).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the "factual determination by [the] state courts are presumed correct absent clear and convincing evidence to the contrary." *Ayers*, 623 F.3d at 308. Accordingly, a decision "adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." While this standard is "demanding" it is "not insatiable." *Id.*

For a writ to issue pursuant to § 2254(d)(1), the Court must find a violation of clearly established federal law "as set forth by the Supreme Court at the time the state court rendered its decision." *Stewart v. Irwin*, 503 F.3d 488, 493 (6th Cir. 2007). This definition of "clearly established federal law" includes "only the holdings of the Supreme Court, rather than its dicta." *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). Nevertheless, "the decisions of lower federal courts may be instructive in assessing the reasonableness of a state court's resolution of an issue." *Stewart*, 503 F.3d at 493.

As previously noted, § 2254(d) provides that habeas relief "shall not be granted with respect to any claim that was adjudicated on the merits" unless the petitioner can satisfy the requirements of either § 2254(d)(1) or § 2254(d)(2). This provision, however, "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington v. Richter*, 131 S.Ct. 770, 785 (2011). Instead, when a federal claim has been presented to a state court and the state court has denied relief, "it may be presumed that the state

court adjudicated the claim on the merits." *Id.* at 784-85.  Where such is the case, the Court must apply the deferential standard of review articulated above, rather than some other less deferential standard.

The presumption that the state court "adjudicated [a] claim on the merits" may be overcome only "when there is reason to think some other explanation for the state court's decision is more likely." *Id.*  If this presumption is overcome, however, the Court reviews the matter de novo.  *See Wiggins v. Smith*, 539 U.S. 510, 533-35 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *see also, Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

## ANALYSIS

### I.          Sufficiency of the Evidence

Petitioner argues that he is entitled to relief because his convictions for conspiracy to commit armed robbery and conspiracy to commit assault with the intent to murder are not supported by constitutionally sufficient evidence.

Claims challenging the sufficiency of the evidence are governed by the standard articulated in *Jackson v. Virginia*, 443 U.S. 307 (1979), pursuant to which it must be determined whether viewing the evidence in the light most favorable to the prosecution and according the benefit of all reasonable inferences to the prosecution, any rational trier of fact could have found Petitioner guilty beyond a reasonable doubt.  *See O'Hara v. Brigano*, 499 F.3d 492, 499 (6th Cir. 2007) (citing *Jackson*, 443 U.S. at 319-26).

When determining whether there exists sufficient evidence to support a conviction the Court may not weigh the evidence, assess the credibility of the witnesses, or substitute its judgment for that of the jury. *See United States v. Paige*, 470 F.3d 603, 608 (6th Cir. 2006). Furthermore, where the record supports conflicting inferences the Court "must presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *O'Hara*, 499 F.3d at 499 (quoting *Jackson*, 443 U.S. at 326).

As of July 9, 2009, Michigan law defined a criminal conspiracy as "a partnership in criminal purposes." *People v. Blume*, 505 N.W.2d 843, 846 (Mich. 1993). Proving the existence of a criminal conspiracy "requires evidence of specific intent to combine with others to accomplish an illegal objective." *People v. Izarraras-Placante*, 633 N.W.2d 18, 21 (Mich. Ct. App. 2001). As is well recognized, however, proving such matters "is often difficult because of the clandestine nature of criminal conspiracies." *People v. Justice*, 562 N.W.2d 652, 658-59 (Mich. 1997). Accordingly, "direct proof of the conspiracy is not essential; instead, proof may be derived from the circumstances, acts, and conduct of the parties." *Id.* at 659. As has been observed, "[w]hat the conspirators actually did in furtherance of the conspiracy is evidence of what they had agreed to do." *People v. Lowery*, 736 N.W.2d 586, 593 (Mich. Ct. App. 2007).

Sufficient evidence was presented at trial from which a reasonable juror could infer that Petitioner and Jason Tarver conspired in this matter to rob and murder Harry Taylor. As Taylor testified, the actions by Petitioner and Tarver were coordinated and in pursuit of the same goal. As the Michigan Court of Appeals concluded:

> The actions of Ashworth and Tarver are evidence of their agreement
> to commit the crimes.   While Tarver held Taylor at gunpoint

> Ashowrth searched Taylor's car.  Both Ashworth and Tarver then took Taylor's possessions.  Ashworth told Tarver to kill Taylor, and both Tarver and Ashworth instructed Taylor to go to the backyard of the house.  Tarver then handed the gun to Ashworth and [he] shot Taylor multiple times when Taylor attempted to escape.  As such, there is sufficient evidence to support Ashworth's conspiracy convictions.

*Ashworth*, 2011 WL 5555825 at *1.

In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

## II.        Double Jeopardy

Petitioner next argues that because his convictions for conspiracy to commit armed robbery and conspiracy to commit assault with the intent to murder were proven "merely by evidence of the substantive offense," his accompanying convictions for the related substantive offenses of armed robbery and assault with the intent to murder violate his right not to be put in jeopardy more than once for the same crime.

The Double Jeopardy Clause provides that "[n]o person shall. . .be subject for the same offense to be twice put in jeopardy of life or limb."  U.S. Const. amend. V.  Whether conviction of two offenses violates double jeopardy is determined by reference to the "same-elements" test.  *See United States v. Dixon*, 509 U.S. 688, 696 (1993).  Pursuant to this test, two

offenses are distinct for double jeopardy purposes if each requires proof of an element that the other does not.  *Id.*

### A.      Armed Robbery

As of July 9, 2009, the elements of armed robbery were: (1) an assault; (2) a felonious taking of property from the victim's presence or person; and (3) while the defendant is armed with a weapon.  *See People v. Rodgers*, 645 N.W.2d 294, 298 (Mich. Ct. App. 2001).  As noted above, a criminal conspiracy is "a partnership in criminal purposes" which "requires evidence of specific intent to combine with others to accomplish an illegal objective."  These offenses each require proof of an element that the other does not.  Accordingly, conviction of both crimes does not violate the Double Jeopardy Clause.  *See also*, *People v. Denio*, 564 N.W.2d 13, 22 ("[w]e have repeatedly held that conspiracy is a crime that is separate and distinct from the substantive crime that is its object").

### B.      Assault with Intent to Commit Murder

As of July 9, 2009, the elements of assault with intent to commit murder were: (1) an assault; (2) with an actual intent to kill; and (3) which, if successful, would make the killing murder.  *People v. Brown*, 703 N.W.2d 230, 236 (Mich. Ct. App. 2005).  A criminal conspiracy is "a partnership in criminal purposes" which "requires evidence of specific intent to combine with others to accomplish an illegal objective."  These offenses each require proof of an element that the other does not.  Accordingly, conviction of both offenses does not violate the Double Jeopardy Clause.  *See also*, *Denio*, 564 N.W.2d at 22.

The Michigan Court of Appeals rejected this claim, concluding:

> The federal and state constitutions prohibit a defendant from being placed twice in jeopardy for the same offense. Conspiracy is a crime that is separate and distinct from the substantive crime that is its object. The crime of conspiracy does not merge into the offense committed in furtherance of the conspiracy. Therefore, consistent with our Supreme Court's holding, Ashworth's double jeopardy rights were not violated.

*Ashworth*, 2011 WL 5555825 at *2 (internal quotations and citations omitted).

In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

## III.        Prosecutorial Misconduct

As noted above, Harry Taylor testified that he first met Petitioner several years previously when both were in jail. Petitioner asserts that the introduction of evidence regarding his prior juvenile incarceration violated his right to a fair trial.

When a petitioner makes a claim of prosecutorial misconduct, "the touchstone of due process analysis...is the fairness of the trial, not the culpability of the prosecutor." *Cockream v. Jones*, 382 Fed. Appx. 479, 484 (6th Cir., June 29, 2010) (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)). Petitioner must do more than show that the prosecutor's conduct was "undesirable or even universally condemned." *Darden*, 477 U.S. at 181. Instead, Petitioner must demonstrate that the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction

a denial of due process." *Id.*; *see also*, *Givens v. Yukins*, 2000 WL 1828484 at *6 (6th Cir., Dec. 5, 2000) ("[t]he aim of due process is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused") (quoting *Phillips*, 455 U.S. at 219). Furthermore, where evidence of guilt is "overwhelming," it is less likely that the jury was influenced by allegedly improper conduct by the prosecutor. *See Darden*, 477 U.S. at 182 ("[t]he weight of the evidence against petitioner was heavy; the 'overwhelming eyewitness and circumstantial evidence to support a finding of guilt on all charges,' reduced the likelihood that the jury's decision was influenced by [improper] argument").

The Supreme Court has recently emphasized that "the *Darden* standard is a very general one, leaving courts 'more leeway. . .in reaching outcomes in case-by-case determinations.'" *Parker v. Matthews*, 132 S.Ct. 2148, 2155 (2012). Furthermore, the standard regarding a prosecutorial misconduct claim "is a high one." *Bales v. Bell*, 788 F.3d 568, 579 (6th Cir. 2015). The Court's role "is not to supervise the state court but to ensure that the state court has not contradicted federal law so as to deny a petitioner due process." *Id.* (citing *Darden*, 477 U.S. at 181). As if to underscore these points, the Supreme Court has recently admonished the Sixth Circuit for resolving prosecutorial misconduct claims, raised in petitions for writ of habeas corpus, by reliance on circuit court authority and self-created multi-factor tests. *Parker*, 132 S.Ct. at 2155.

Petitioner argues that introduction of testimony that he was previously incarcerated constituted improper evidence of prior crimes or bad acts. However, the United States Supreme Court has never held that a state violates due process by permitting propensity evidence in the form of other bad acts evidence. *See Bugh v. Mitchell*, 329 F.3d 496, 512-13 (6th Cir. 2003) ("there is no clearly established Supreme Court precedent which holds that a state violates due process by

permitting propensity evidence in the form of other bad acts evidence"). Thus, Petitioner cannot establish that introduction of the testimony in question was improper.

Moreover, even if it assumed that the evidence was improper, Petitioner cannot establish that his trial was, as a result, so infected with unfairness as to deprive him of the right to a fair trial. First, before Harry Taylor even took the stand the jury was informed that Petitioner had previously been convicted of a felony. Because Petitioner was charged with being a felon in possession of a firearm, the prosecution proposed to Petitioner the following: (1) stipulate that he had previously been convicted of a felony; or (2) the prosecution would present evidence that Petitioner had previously been convicted of a felony for failing to register as a sex offender. (Trial Transcript, May 20, 2010, 90-91). Petitioner agreed to stipulate that he had previously been convicted of a felony and this was related to the jury before Taylor even testified. (Tr. 99-100). Thus, Taylor's objectionable testimony merely provided context as to a fact of which the jury was already aware. The Court fails to discern how such deprived Petitioner of a fair trial. Such is further supported by the conclusion that the evidence against Petitioner was overwhelming.

The Michigan Court of Appeals rejected this claim on the ground that the testimony in question was "harmless." *Ashworth*, 2011 WL 5555825 at *2. In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

IV.          **Ineffective Assistance of Counsel**

Petitioner argues that he is entitled to relief because his trial counsel provided constitutionally deficient representation.  Specifically, Petitioner faults his attorney for failing to object to the testimony by Harry Taylor that he first met Petitioner in jail.

To establish ineffective assistance of counsel, Petitioner must show both deficient performance by his counsel and prejudice resulting therefrom.  *See Premo v. Moore*, 562 U.S. 115, 121 (2011) (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)).  To establish deficient performance, Petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *Premo*, 562 U.S. at 121 (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)).  A court considering a claim of ineffective assistance must apply a "strong presumption that counsel's representation was within the 'wide range' of reasonable professional assistance." *Premo*, 562 U.S. at 121 (quoting *Strickland*, 466 U.S. at 689).  Petitioner's burden is to show that "counsel made errors so serious that [he] was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Premo*, 562 U.S. at 121-22 (quoting *Strickland*, 466 U.S. at 687).

Petitioner must further establish that he suffered prejudice as a result of his attorney's allegedly deficient performance.  Prejudice, in this context, has been defined as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Premo*, 562 U.S. at 122 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)); *see also*, *Mahdi v. Bagley*, 522 F.3d 631, 636 (6th Cir. 2008).  The issue is whether counsel's representation "amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Premo*, 562 U.S. at 122 (quoting *Strickland*, 466 U.S. at 690).  This is a heavy burden for Petitioner to meet, because he must establish that his

counsel's performance was "so manifestly ineffective that defeat was snatched from the hands of probable victory." *Jacobs v. Mohr*, 265 F.3d 407, 418 (6th Cir. 2001).

As the Supreme Court has made clear, even when reviewing an ineffective assistance of counsel claim *de novo*, "the standard for judging counsel's representation is a most deferential one." *Premo*, 562 U.S. at 122. Likewise, the standard by which petitions for habeas relief are judged is "highly deferential." Thus, when reviewing, in the context of a habeas petition, whether a state court unreasonably applied the *Strickland* standard, review is "doubly" deferential. *Id.* (citations omitted). As the *Premo* Court concluded:

> The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating reasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* at 122-23 (internal citations omitted).

Even if the Court assumes that counsel's failure to object constitutes deficient performance, Petitioner cannot establish that he was prejudiced by such. As discussed above, Taylor's testimony that he first met Petitioner in jail was harmless and merely provided context regarding a fact of which the jury was already aware.

The Michigan Court of Appeals rejected this claim on the ground that Petitioner could not establish that he suffered prejudice as a result of his attorney's allegedly deficient conduct. *Ashworth*, 2011 WL 5555825 at *2-3. Specifically, the court concluded that, "the result of the trial would not have been different had defense counsel objected." *Id.* at *3. In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an

unreasonable application of, clearly established federal law.  Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

## V.        Sentencing Claim

Finally, Petitioner argues that his "judgment of sentence must be amended because [his] sentence for felony firearm was erroneously imposed consecutively to his conviction for conspiracy to commit assault with intent to commit murder."  Petitioner raised this issue below and the Michigan Court of Appeals expressly ruled in Petitioner's favor.  Specifically, the court concluded:

> At sentencing, the trial court ordered that Ashworth's felony-firearm sentences run consecutive to not only the sentences for the underlying felonies, but also the sentence for conspiracy to commit assault with the intent to murder.  Since conspiracy to commit assault with the intent to murder was not the specific underlying felony for any of Ashworth's felony-firearm convictions, the trial court erred.

> We affirm Ashworth's convictions and sentences, but we remand solely for the ministerial purpose of amending the judgement of sentence.  We do not retain jurisdiction.

*Ashworth*, 2011 WL 5555825 at *4.

On November 16, 2011, the trial court entered an Amended Judgment of Sentence in accordance with the aforementioned decision.  (Dkt. #18).  Accordingly, this particular issue is moot and cannot form the basis for relief by this Court.  *See, e.g., Johnston v. Berghuis*, 2015 WL 1646648 at *1 (E.D. Mich., Apr. 14, 2015) ("a claim for habeas relief becomes moot when the controversy between the parties is no longer alive because the party seeking relief has obtained the relief requested").  The Court further concludes that the present circumstance does not fit within the

"capable of repetition, yet evading review" exception to mootness.  *See Chirco v. Gateway Oaks, L.L.C.*, 384 F.3d 307, 309 (6th Cir. 2004) (where there does not exist a reasonable expectation that the party will be subject to the same action or harm again, the exception to mootness does not apply).


## CONCLUSION

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States.  Accordingly, the undersigned recommends that Ashworth's petition for writ of habeas corpus be **denied**.  The undersigned further recommends that a certificate of appealability be denied.  *See Slack v. McDaniel*, 529 U.S. 473 (2000).

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice.  28 U.S.C. § 636(b)(1)(C).  Failure to file objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).


Respectfully submitted,

Date: March 8, 2016                     /s/ Ellen S. Carmody
                                        ELLEN S. CARMODY
                                        United States Magistrate Judge